```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )     Case No. 3:22-CR-00113-DJH
 4                                  )
              Plaintiff,            )
 5                                  )
     v.                             )
 6                                  )
     JALEN WILSON,                  )
 7                                  )     August 24, 2023
              Defendant.            )     Louisville, Kentucky
 8

 9                             *  *  *  *  *

10                      TRANSCRIPT OF SENTENCING
                     BEFORE HONORABLE DAVID J. HALE
11                    UNITED STATES DISTRICT JUDGE

12                             *  *  *  *  *

13   APPEARANCES:

14   For United States:        Alicia P. Gomez
                               U.S. Attorney's Office
15                             717 West Broadway
                               Louisville, KY 40202
16
     For Defendant:            Kayla M. Campbell
17                             Wicker Brammell, PLLC
                               323 West Main Street, 11th Floor,
18                                Suite 2100
                               Louisville, KY 40202
19
     [Defendant present.]
20

21
                          Dena Legg, RDR, CRR, CCR-KY
22                         Official Court Reporter
                             208 U.S. Courthouse
23                         Louisville, KY 40202
                              (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1       (Begin proceedings in open court at 9:46 a.m.)

2              DEPUTY CLERK:  3:22-CR-113, United States of America

3   v. Wilson.

4              MS. GOMEZ:  Good morning, Your Honor.  Alicia Gomez

5   for the United States.

6              MS. CAMPBELL:  Good morning, Your Honor.  Kayla

7   Campbell on behalf of Defendant Jalen Wilson.

8              THE COURT:  Good morning.  We're here for a sentencing

9   hearing.  Ms. Campbell, have you and Mr. Wilson received and

10  reviewed the presentence investigation report?

11             MS. CAMPBELL:  Yes, Your Honor.

12             THE COURT:  And does that include the recent revised

13  report, I think within the last day or two?

14             MS. CAMPBELL:  Yes, Your Honor.  We talked about it

15  before court this morning.

16             THE COURT:  All right.  Mr. Wilson, have you had

17  enough time to go through the PSR with Ms. Campbell?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Let's begin by talking about the guideline

20  calculations contained in the report, and then we'll take up,

21  Ms. Campbell, any objections that remain outstanding.

22      This case and the guidelines here -- it's important, I

23  think, for us all to remember that the United States Sentencing

24  Guidelines are merely advisory.  The court is not bound by the

25  recommendations made by the guidelines.  And it is unusual here

1    because this case is -- the guidelines here are largely driven

2    by the calculations associated with methamphetamine.  This case

3    involves both methamphetamine and fentanyl, but because of the

4    weight of the -- the significant amount of methamphetamine

5    involved in these charges, the guidelines are driven by

6    methamphetamine.

7        I have previously made my position regarding the guidelines'

8    treatment of methamphetamine clear.  And so I will use this

9    opportunity to repeat what I have previously said, and that is I

10   find the guidelines' treatment of methamphetamine troubling.

11   And, therefore, I will assert what is generally referred to as a

12   categorical policy disagreement with the guidelines as they

13   treat methamphetamine.

14       And the reason for this is because the guidelines have three

15   categories of meth.  Ice and what is referred to as "pure," or

16   actual methamphetamine, those two categories are treated the

17   same.  And then methamphetamine that is a mixture or substance

18   containing methamphetamine is treated differently.

19       And my reasons for disagreeing with how the guidelines do

20   this follow largely the reasoning of other courts.  I am only

21   the latest in a long list of courts to be troubled by the

22   guidelines' treatment of methamphetamine.  I will refer

23   specifically to an opinion written by a District Court in New

24   Hampshire, *U.S. v. Bean*, 371 F.Supp. 3d at page 46, a 2019 case.

25   And my reasons are very similar to that judge.  There appears to

1   be no empirical or data-driven basis for the guidelines' harsher

2   treatment of offenses involving higher purity meth.

3       Meth purity is also no longer an accurate indicator of a

4   defendant's specific role in a drug trafficking conspiracy.  It

5   might have been at one time earlier in our history.  As recently

6   as ten years ago, it might have been an accurate indicator of

7   someone's role, a higher purity level meaning closer proximity

8   to the source, but that is -- we know from more recent studies

9   and anecdotally we know that.  As judges, our experience also

10  teaches us that.  It's consistent with the data that that is no

11  longer the case.

12      And then, finally, in persisting with this disparity, the

13  guidelines create unwarranted sentencing disparities between

14  meth offenses and offenses involving other major drugs.  And so

15  for all of those reasons, I will state for the record that I

16  will sentence Mr. Wilson based upon the guideline as applied for

17  mixture or substance and not for actual methamphetamine.

18      Now, one of the best practices, I think, that has come out

19  of this recent discussion about the methamphetamine guidelines

20  is one that I am also following, and that is the reason for the

21  recent revision to the PSR.  I think the Government also pointed

22  out the best practice in a recent filing.  So let's go there now

23  and discuss the guideline calculations.

24      The way that the revised PSR presents the calculations is it

25  first, beginning in paragraph 24, presents the calculations for

actual methamphetamine.  The PSR refers to this calculation as purity driven.  Guideline 2D1.1(c) refers to actual methamphetamine, and that's what we're talking about here.  The guideline base offense level would be 36.  That's based upon the converted drug weight and the table.

There are two levels added in paragraph 25 for maintaining a premises for the purposes of manufacturing or distributing.  That gets us to an adjusted offense level of 38.  After applying all three levels of acceptance of responsibility, we get to a total offense level of 35.  Separately, Mr. Wilson's criminal history score has been determined to be in Category IV.  And so a 35 applied to a Category IV results in a guideline recommended sentence of 235 months to 293 months.

Let's just pause there, and let me ask counsel if I have stated that particular guideline calculation correctly.

Ms. Gomez?

MS. GOMEZ:  Yes, Your Honor.

MS. CAMPBELL:  Yes, Your Honor.

THE COURT:  Alternatively, the PSR presents the meth guideline for a mixture and substance, and this dual presentation properly demonstrates the contrast and the outcome here of disparate treatment for methamphetamine based solely on its relative purity.

The base offense level in paragraph 34 for mixture or substance of -- containing methamphetamine is a 32.  That's

1    2D1.1 -- I believe it's (a)(4) based upon the converted drug

2    weight and the table.

3        And then with respect to the same offense characteristics

4    adding two levels in paragraph 34 for maintaining a premises for

5    the purpose of manufacturing or distributing a controlled

6    substance, that gets to an adjusted offense level of 34.  And

7    then again -- and I presume, Ms. Gomez, the Government has no

8    objection to all three levels of acceptance of responsibility

9    being credited here.

10              MS. GOMEZ:  That's correct, Your Honor.

11              THE COURT:  And that gets us to a total offense level

12   of 31.  And a 31 against that Criminal History Category IV

13   results in a guideline recommended sentence of between 151 and

14   188 months, a five-year term of supervised relief -- I'm sorry

15   -- release, and a fine range of between 30,000 and $10 million.

16       So, again, have I stated the alternative guideline

17   calculations correctly as they are found in the PSR?

18              MS. GOMEZ:  Yes, Your Honor.

19              MS. CAMPBELL:  Yes, Your Honor.

20              THE COURT:  Based upon my categorical policy

21   disagreement with the treatment of methamphetamine offenses in

22   Guideline 2D1.1, I will apply in this case and in all -- as I

23   stated previously, in all methamphetamine driven cases in the

24   future the second category with a calculation for mixture or

25   substance containing methamphetamine.  So we will be operating

1    from that basis.

2         Does either counsel wish to add to the discussion on the

3    court's policy disagreement here?

4              MS. GOMEZ:  Your Honor, I just want to say thank you

5    for allowing that change in the PSR.  I understand the Court's

6    categorical policy disagreement with the guidelines.  I just --

7    I agree with the Court that showing the two different ways is

8    appropriate.  So thank you for making that change.  I don't have

9    anything else.

10             MS. CAMPBELL:  I agree with the Court, and I don't

11   have anything to add.  Thank you, Your Honor.

12             THE COURT:  Very well.

13        So let's now talk about objections.  Does the Government

14   have any further objections to take up?

15             MS. GOMEZ:  I don't have any objections, Your Honor.

16             THE COURT:  Ms. Campbell?

17             MS. CAMPBELL:  Yes, Your Honor.  There's one

18   unresolved objection to the PSR, but it most likely won't have

19   an impact on Mr. Wilson's sentence.  But if the Court would like

20   to hear brief argument --

21             THE COURT:  That's entirely up to you.

22        Let me also now inform the parties that I have carefully

23   studied the presentence investigation report and the submissions

24   of counsel.  I took Mr. Wilson's change of plea at the earlier

25   hearing some months back, and from that comprehensive review, I

1    have determined that I will accept the parties' (C) plea

2    agreement and sentence accordingly.  If that changes your

3    approach, that's fine.  If you would like to have the objection

4    resolved irrespective of its impact, that's fine too.

5            MS. CAMPBELL:  Your Honor, just for the record, I

6    would rely on my memo which outlines the objection.  And I would

7    just for the record state that we object to probation's

8    application of the two-point enhancement for maintaining a drug

9    premises pursuant to Section 2D1.1(b)(12) of the sentencing

10   guidelines for the reasons stated in my memo.

11           THE COURT:  Very well.  Does the Government have any

12   further response?

13           MS. GOMEZ:  No, Your Honor.

14           THE COURT:  I'm gonna overrule the objection.  And in

15   so doing, I will rely in large part on the PSR, specifically

16   paragraph 11, which notes that Mr. Wilson invited a drug

17   transaction in the location identified there, and I think that

18   that then meets the minimal standard for application of that

19   enhancement.  Because I have accepted the parties' (C) plea

20   agreement, it will have no impact on his ultimate sentence.  So

21   I do want to make that clear to Mr. Wilson, but I am -- for the

22   record, I will overrule the objection.

23       Anything further?

24           MS. CAMPBELL:  No, Your Honor.

25           THE COURT:  By way of objection, I should say?

1        MS. CAMPBELL:  No, Your Honor.

2        THE COURT:  I will then adopt the PSR.  It will be

3    filed in the record under seal.  In the event of an appeal, of

4    course, the parties, court, and counsel will have access to it.

5        Now, do we have any motions to take up?

6        MS. GOMEZ:  I do, Your Honor.  I'd like to make a

7    motion under seal.

8        THE COURT:  All right.  Let me then invite counsel and

9    the defendant to approach the bench for our discussion on the

10    sealed record.

11        (Bench conference filed under seal.)

12        THE COURT:  Any other motions to take up at this time,

13    Ms. Campbell?

14        MS. CAMPBELL:  No, Your Honor.

15        THE COURT:  And is there any further argument or

16    discussion with respect to the factors set out by Congress in

17    Section 3553(a) of Title 18?

18        MS. GOMEZ:  Your Honor, just for the United States, we

19    believe that a sentence of 120 months is appropriate for this

20    defendant based on -- obviously, the nature and circumstances of

21    this offense are very serious and the history and

22    characteristics of the defendant, but the 120-month sentence is

23    a sentence that is sufficient but not greater than necessary.

24    It also will give the defendant an ability to receive treatment

25    hopefully while in custody and will provide deterrence from

1   future criminal conduct.  So we believe that this sentence of

2   120 months is appropriate as to this defendant, Your Honor.

3          THE COURT:  And am I correct that Counts 1, 3, and 6

4   carry with them a mandatory minimum sentence of 120 months?

5          MS. GOMEZ:  That is correct, Your Honor.

6          THE COURT:  Ms. Campbell, anything further with

7   respect to those same factors?

8          MS. CAMPBELL:  Your Honor, I addressed most of those

9   factors in my memo that was filed last week, I believe, but if

10  the Court will indulge me, I would like to spend just a few

11  minutes talking about Mr. Wilson's personal history and

12  characteristics.

13      I've known Mr. Wilson for about a year now, and I've had the

14  opportunity to learn that he's gone through a lot in his

15  relatively short life.  He's 27, soon to be 28.  He shared with

16  me that he had a great childhood.  He was raised by a loving mom

17  and a grandmother, and he spent a lot of time with his father on

18  the weekends.  He has six siblings, and he remains close with

19  his family today.  In fact, both his mom and his sister are here

20  today for him.

21      In 2011, around 16 or 17 years old, his older brother was

22  incarcerated and like maybe a month later his best friend was

23  shot and murdered.  Mr. Wilson didn't know how to cope with the

24  sudden loss of two really important people in his life, which

25  led to him seeking treatment at Our Lady of Peace for a couple

of months.  And he still struggles with coping and dealing with that trauma 12 years later.

The next year wasn't any easier for Mr. Wilson.  In 2012, two of his other close friends were shot, and only one survived. And then, unfortunately, Mr. Wilson himself was a victim of gun violence.  And he was shot in the butt and left thigh area, and he was hospitalized for three days.  This seems to have been a turning point in Mr. Wilson's life and, unfortunately, it wasn't for the best.  As you can see from his criminal history, he started having run-ins with the law, mostly for nonviolent and minor offenses.

Despite these mistakes, Mr. Wilson tried to get his life together.  He obtained his GED while in prison.  And since he's gotten out of custody, he's devoted his life to helping take care of his late grandmother, his mother, and his sister and his nephews.

Ultimately, Mr. Wilson understands that he has committed a serious crime, and he asks the Court to consider the nature and circumstances of the nonviolent crime along with his personal history and characteristics.

Over the past year I've learned that Mr. Wilson isn't a bad person like some of the people that stand before this Court, but he's a young man who lost his way.  And he doesn't want this to define the rest of his life.  In fact, he told me recently that he hopes to write a book about his life and the mistakes he's

1    made so others won't make the same.

2        Mr. Wilson is ready to accept the consequences of his

3    mistake, and he's eager to leave those mistakes in the past.

4    So, Your Honor, the defense submits that the agreed upon

5    sentence of 120 months or ten years' incarceration is sufficient

6    but no greater than necessary to address the charges and

7    Mr. Wilson's history.  Thank you.

8            THE COURT:  Thank you, Ms. Campbell.

9        Does Mr. Wilson wish to address the court?

10            THE DEFENDANT:  I would just like to apologize to my

11    family and the Court.

12            THE COURT:  All right.

13            MS. CAMPBELL:  Thank you.

14            THE COURT:  Thank you, Mr. Wilson.

15        Anything further from the United States?

16            MS. GOMEZ:  No, Your Honor.

17            THE COURT:  Ms. Campbell, anything further?

18            MS. CAMPBELL:  No, Your Honor.

19            THE COURT:  Are the parties then ready for me to state

20    the sentence?

21            MS. GOMEZ:  Yes, Your Honor.

22            MS. CAMPBELL:  Yes, Your Honor.

23            THE COURT:  I have already indicated by a prior ruling

24    that I will accept the parties' (C) plea agreement and sentence

25    accordingly.  That followed from my careful review of the

1    presentence investigation report and the parties' submissions.

2        I have further considered the sentencing guidelines, as we

3    have discussed at length, the arguments of counsel as well as

4    the factors set out by Congress in Title 18 of the U.S. Code at

5    Section 3553(a).  From this review and our discussion here today

6    in this hearing, I will now impose the following sentence:

7        It is the judgment of the court that the defendant, Jalen

8    Wilson, is committed to the custody of the Bureau of Prisons for

9    a term of 120 months as to each of Counts 1, 2, 3, 4, and 6 in

10   the indictment, which shall be served concurrently for a total

11   term of 120 months' imprisonment.

12       Upon release, Mr. Wilson shall be placed on supervised

13   release for a term of five years as to each of Counts 1, 2, 3,

14   4, and 6 in the indictment, which shall also be served

15   concurrently for a total term of five years.

16       While on supervised release, Mr. Wilson shall abide by the

17   standard conditions of supervision adopted by the court as well

18   as a number of special conditions that have been detailed in

19   Part G of the presentence investigation report.  These include

20   being subject to search and substance abuse treatment and

21   testing.  The U.S. Probation Office will answer any questions

22   Mr. Wilson may have regarding the requirements of these

23   conditions.

24       The defendant is required to pay a special penalty

25   assessment fee of $100 as to each count of conviction for a

1   total of $500.  Restitution is not an issue in this case, and

2   given Mr. Wilson's inability to pay, I will waive imposition of

3   a fine as well as the associated costs.

4       I have carefully considered the history and characteristics

5   of Mr. Wilson.  He does have, unfortunately at his young age, a

6   significant criminal history.  As Ms. Campbell has emphasized

7   and as I have noted from my review of the PSR, he has also been

8   a gunshot victim himself, suffered from the significant trauma

9   of violent episodes involving friends and family, and no doubt

10  his conduct has been impacted by those experiences.

11      I have also considered the nature and circumstances of the

12  offenses here.  This case, as we have discussed, involves

13  distribution of significant amounts of methamphetamine as well

14  as fentanyl.  Both of these substances are dangerous and are

15  contributing to serious problems in our community and throughout

16  the country.

17      As outlined at the outset here, the guidelines produce a

18  total offense level of 31 against a criminal history category of

19  IV, resulting in a guideline range of 151 to 188 months'

20  custody, a fine range of 30,000 to 10 million, and a range of

21  five years of supervised release.

22      As to the other factors set forth in Section 3553(a), I

23  conclude that this sentence, while below the range recommended

24  by the guidelines, nevertheless properly reflects the

25  seriousness of these offenses, will promote respect for the law

1    and afford adequate deterrence.  This combination of 120 months'

2    incarceration, followed by five years of supervised release,

3    will also protect the public from further crimes of the

4    defendant.

5        Having accepted the parties' (C) plea agreement, I further

6    conclude that a sentence of 120 months in custody, followed by

7    five years of supervised release, is sufficient but not greater

8    than necessary to comply with the purposes set forth in

9    Section 3553(a)(2).  It satisfies the applicable statutory

10   provisions, including the mandatory minimum sentence applicable

11   to Counts 1, 3, and 6, and it conforms with the parties' plea

12   agreement.  In sum, I find it to be just punishment.

13       Any objections now to the sentence that I have just

14   announced or the special conditions which have not previously

15   been raised?

16           MS. GOMEZ:  No, Your Honor.

17           MS. CAMPBELL:  Nothing from the defense, Your Honor.

18           THE COURT:  Let's now discuss Mr. Wilson's appeal

19   rights.  I believe, Ms. Gomez, that the parties' plea agreement

20   contains an appeal waiver; is that correct?

21           MS. GOMEZ:  That is correct, Your Honor.

22           THE COURT:  And so, Mr. Wilson, you may recall from

23   your change of plea hearing how we discussed that in exchange

24   for the concessions made in your plea agreement, you agreed to

25   waive your right to appeal your guilty plea or the sentence that

1    I just imposed here if it is consistent with the parties' plea

2    agreement, which it is.  There are only two exceptions to this.

3       Now, these appeal waivers are generally considered valid.

4    And so if you have a theory that yours is invalid, you may

5    present that to the Court of Appeals.  And you may appeal on the

6    basis of either or both of the exceptions to your appeal waiver,

7    those being a claim of ineffective assistance of counsel and/or

8    prosecutorial misconduct.

9       To start your appeal, you must first file a notice.  And if

10    you need the assistance of the clerk's office in doing that,

11    they will upon request assist you.  It must be done within

12    14 days of the entry of judgment.  If you cannot afford the

13    filing fee, you may ask that it be waived; and if you cannot

14    afford counsel on appeal, you may ask that counsel be appointed

15    to represent you free of charge.  Do you understand your appeal

16    rights that I've outlined for you?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  Anything further with respect to advice to

19    Mr. Wilson on his appeal rights, Ms. Campbell?

20           MS. CAMPBELL:  No, Your Honor.

21           THE COURT:  Anything by way of request for a judicial

22    recommendation to be included in the judgment?

23           MS. CAMPBELL:  Yes, Your Honor.  Mr. Wilson would like

24    to make two requests, the first being that he can stay close to

25    home -- as close to home as possible so that his family can

1    visit him.

2        And, if possible, he'd also like to go to a facility that

3    offers CDL or HVAC programs.  Those are two things that he's

4    really interested in doing when he's out of custody.  And the

5    third, Mr. Wilson would like to participate in RDAP, if

6    possible, if he qualifies as a candidate.

7            THE COURT:  Very well.  And those would be in order of

8    priority?

9        I typically -- Mr. Wilson, let me first say that it is

10   typical for a sentencing court to include recommendations to the

11   Bureau of Prisons in a judgment.  The law does not give me the

12   authority to order the Bureau of Prisons to place a defendant in

13   any particular institution or any particular program.  All I can

14   do is recommend.

15       And so I do those typically in order of priority, and the

16   reason is because not all facilities contain the same programs.

17   And so if the most important thing is being close to home, I'll

18   list that first.  And if the most important thing is the

19   residential -- being in a facility that offers the Residential

20   Drug Abuse Program, I'll recommend that first.  That's why I

21   asked Ms. Campbell what the priorities are here.

22       (Ms. Campbell conferring with defendant off the record.)

23           THE DEFENDANT:  I was just wondering -- like, I don't

24   know exactly how they do it.  Like, I think I had read somewhere

25   you got to be a certain limit remaining on your time to be

1    eligible for RDAP.  So I'm like, if I wasn't eligible right

2    away, could that be like the second option instead of being the

3    first one in case I wouldn't be eligible for it?

4            THE COURT:  Right.  I don't -- I will confess, I don't

5    keep up with Bureau of Prison's regulations and policies.  So

6    you couldn't quote me on this, but I understand that it's

7    somewhere in the two- to three-year range that one must have

8    remaining to enter the RDAP program.  I'm not 100 percent sure

9    that that's how it works.  I certainly do not sentence on that

10   basis, but I'm happy to recommend it.

11       It's my experience, Mr. Wilson -- Ms. Campbell has probably

12   heard me say this before in other cases.  BOP does their best to

13   follow judicial recommendations.  So the priority is important

14   in a sense in the way that we organize what I say there, but

15   it's been my experience that they do their best to try and

16   follow those recommendations whenever possible.

17       So I'll -- unless Ms. Campbell thinks otherwise, I'll just

18   list them in the order in which she stated them here.  And

19   nothing prevents Ms. Campbell from following up and

20   communicating with the Bureau of Prisons in your behalf

21   regarding those recommendations.

22           THE DEFENDANT:  Okay.

23           THE COURT:  All right.

24           MS. CAMPBELL:  That's fine, Your Honor.

25           THE COURT:  Anything else we need to take up?

1          MS. GOMEZ:  No, Your Honor.

2          MS. CAMPBELL:  No, Your Honor.

3          THE COURT:  Mr. Wilson, let me just take a minute as

4    we finish up here to say that this is, I know, a very difficult

5    day for you as well as your family.  And I would not suggest

6    anything other than a difficult day, a day for reflection and a

7    day to really consider your recent past and the poor decisions

8    that have gotten you here.

9          But it is also, it seems to me, an opportunity to reflect

10   upon how it could have been much worse.  You saw those

11   guidelines.  You heard me talk about those guidelines.  Your

12   sentence today literally could have been twice what it was under

13   the guidelines.  And you have an opportunity to observe -- to

14   reflect upon the fact that you have benefited from your

15   counsel's advocacy, and you also benefited from the Government

16   taking a responsible position.

17         And so as young as you are, while this is a daunting and

18   substantial sentence, you will still be young when you have

19   completed it.  And at the end of your term of incarceration, you

20   will begin a term of supervised release.  You may not remember

21   very much about today when that time comes, but I do -- if you

22   can, I do want you to recall -- and I hope your family will

23   recall me saying this -- that I see from the PSR a great deal of

24   potential.

25         I agree with Ms. Campbell.  I think you were impacted by the

traumatic events of your youth that impacted -- that's not an excuse.  You made bad decisions, and you admitted that.  You owned up to it.  So I'm not changing my view there, but I am acknowledging that you had some events in your past that overcame your good upbringing and your good training, but it doesn't permanently reverse that.

You do have the opportunity -- given how young you are and given that you have some record of achievement in this PSR that I read, you can take vocational training while you're in the BOP system.  You can come out and get your life on track and be an important and meaningful contributor to your family and your community.  Those opportunities are still before you, but you have to make a decision.  Really, it needs to be made now if it hasn't already been.

And certainly when you leave the BOP and you begin your term of supervised release, to put all of this behind you, to put all of these entanglements with the people and the drugs and all of that that got you here -- because you do have potential.  You do have -- I read about your extraordinary family.  You have support, and you're gonna have to lean on that going forward.

And then you're gonna have to view your term of supervised release as not further punishment, not just something else the Government's doing to weigh me down, but view your term of supervised release as the opportunity that it is.  They will help you.  They will equip you.  They will hold you accountable,

1    which you will need, along with your family, to do that, and

2    that is going to keep you on the path, but it starts with you.

3        I think you have the potential to do just that.  I don't say

4    this to everyone that comes before me.  I wish I could, but

5    honestly I cannot.  In this case I can.

6        And so I wanted to offer these words to you.  They may

7    not -- they may seem hollow, given what you're facing, but I do

8    hope that you will remember down the road that your decision-

9    making and your decision to turn a corner and to take advantage

10   of those opportunities will provide you a path to a life that is

11   much, much better than the path that got you here.

12       Is that what you see for your future, Mr. Wilson?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  All right.  Thank you to Mr. Wilson's

15   family for being here, and I wish you good luck.

16       Thank you.  We'll be in a brief recess.

17       (Proceedings concluded at 10:24 a.m.)

18                    C E R T I F I C A T E

19       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

20   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22

23   _____s/Dena Legg_____        November 28, 2023
     Certified Court Reporter No. 20042A157    Date
     Official Court Reporter

24

25